**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**July 13, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

JERRY SHARPE-MILLER,

    Plaintiff - Appellant,

v.

WALMART, INC.,

    Defendant - Appellee.

----------------------------------

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

    Amicus Curiae.

No. 24-2055

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:22-CV-00406-KWR-GJF)**
_____

Derek V. Garcia, New Mexico Legal Aid, Inc., Albuquerque, New Mexico, for the Plaintiff-Appellant.

Larry J. Montaño, Holland & Hart LLP, Santa Fe, New Mexico (Olga M. Serafimova, Holland & Hart, LLP, Santa Fe, New Mexico and Clara B. Burns, Kemp Smith LLP, El Paso, Texas, with him on the brief), for Defendant-Appellee.

Chelsea C. Sharon, Attorney (Karla Gilbride, General Counsel; Jennifer S. Goldstein, Associate General Counsel; and Anne Noel Occhialino, Assistant General Counsel, with her on the brief), The Equal Employment Opportunity Commission, Office of General Counsel, Washington, D.C., as Amicus Curiae in support of Plaintiff-Appellant.
_____

Before **HOLMES**, Chief Judge, and **MURPHY**, Circuit Judge.[*]

_____

**HOLMES**, Chief Judge.

_____

Jerry Sharpe-Miller sued his former employer, Walmart, Inc., for discriminating against him because of his sexual orientation. He brought various kinds of claims under Title VII of the Civil Rights Act of 1964 and the analogous New Mexico Human Rights Act ("NMHRA"). He brought disparate-treatment claims based on a demotion and a temporary firing, alleging they were motivated by anti-gay animus. He brought a retaliation claim, alleging that Walmart supervisors took actions against him for opposing unlawful discrimination. He brought a hostile-work-environment claim, contending that Walmart employees subjected him to such severe or pervasive anti-gay harassment that it effectively altered his terms or conditions of employment. Lastly, he brought a constructive-discharge claim, asserting that the alleged discrimination was so intolerable that he had no reasonable choice but to quit. The district court granted summary judgment to Walmart on all Mr. Sharpe-Miller's claims, and he appeals.

We affirm as to all but Mr. Sharpe-Miller's hostile-work-environment claim. More specifically, we conclude that Mr. Sharpe-Miller's demotion-based claim is barred

---

[*] Per the court's April 18, 2025 Order, the Honorable Carolyn B. McHugh, who attended the March 18, 2025, oral argument for this case, determined it was necessary to recuse, and she does not participate in this opinion. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal).

by the statute of limitations, and that he has not adequately challenged the district court's ruling on his termination-based claim. We agree with the district court's grant of summary judgment against Mr. Sharpe-Miller's retaliation claim because he has not pointed to evidence that he engaged in opposition to unlawful discrimination. We also agree with the district court that Mr. Sharpe-Miller has not provided evidence of such intolerable discrimination that would be required to support a constructive-discharge claim.

We disagree, however, with the district court's analysis of Mr. Sharpe-Miller's hostile-work-environment claim. Mr. Sharpe-Miller has provided evidence that he was subjected to a significant amount of anti-gay discrimination at work, including at least two outrageous acts. Yet, the district court mistakenly excluded or discounted multiple relevant discriminatory acts. And it relied on an incomplete statement of the law when it stated that a hostile-work-environment claim can only succeed if the plaintiff is subjected to a "steady barrage" of discrimination. Aplt.'s App., Vol. II, at 314 (Mem. Op. & Order, filed Dec. 28, 2023) (quoting *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 922 (10th Cir. 2009)). The "steady barrage" formulation is in some of our decisions, but our case law makes clear that, in certain circumstances, a smaller number of discriminatory acts can also create a hostile work environment. Factoring in the discriminatory acts that the district court factored out and taking account of the other discriminatory acts that Mr. Sharpe-Miller alleged, we hold that Mr. Sharpe-Miller has cited enough evidence for a reasonable jury to find that he was subjected to a hostile work environment.

3

Therefore, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm in part, reverse in part, and remand** the case for further proceedings on Mr. Sharpe-Miller's hostile-work-environment claim.

## I. Background

## A. Factual Background[1]

Mr. Sharpe-Miller is a gay man. He began working for Walmart in April 2017. At first, Mr. Sharpe-Miller worked as a stocker/unloader on the "Cap 2 team." Walmart quickly offered Mr. Sharpe-Miller a promotion to the Cap 2 supervisor position, but he declined. During his time on the Cap 2 team, Mr. Sharpe-Miller had a conversation with an assistant store manager, Aaron Jones. Mr. Sharpe-Miller did "[n]ot really" report to Mr. Jones, but Mr. Jones "would check in on Cap 2" occasionally. Aplt.'s App., Vol. II, at 393, Tr. 118:2–5 (Dep. of Jerry Sharpe-Miller, dated Apr. 26, 2023). Mr. Jones asked Mr. Sharpe-Miller if a man he had seen Mr. Sharpe-Miller shopping with was Mr. Sharpe-Miller's partner. Mr. Sharpe-Miller said that he was not. Mr. Jones responded, "[G]ood—if homosexuals got any more rights, th[en] we might as well

---

[1] We derive these background facts from the materials submitted at summary judgment—primarily, Mr. Sharpe-Miller's deposition testimony. We acknowledge that Walmart disputes the veracity of much of that testimony. But at the summary judgment stage, we do not evaluate Mr. Sharpe-Miller's credibility or render conclusive judgments regarding the truth of his averments. Rather, we take the facts in the light most favorable to Mr. Sharpe-Miller to determine whether a reasonable jury *could* find in his favor. *See, e.g.*, *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005) ("But a plaintiff facing summary judgment does not have to conclusively establish the truth. She must only establish that there is a genuine factual dispute with regard to the truth, and in this she has succeeded. Choosing between these two possibilities is exactly the type of determination a jury is empowered to make.").

legalize pedophilia and bestiality." *Id.* at 415, Tr. 203:3–13. Mr. Sharpe-Miller testified that another coworker, Andrew Spicer, asked "if he was afraid to break a nail" while they were breaking down a pallet. *Id.* at 396, Tr. 128:4–12. Mr. Spicer and another coworker named Emilio used the slurs "'faggot' [and] 'butt pirate' on a regular basis." *Id.* at 415, Tr. 204:5–22. After about a year with the Cap 2 team, Mr. Sharpe-Miller requested and was granted a transfer to the "Cap 1 team" at the same store.

While working on the Cap 1 team, Mr. Sharpe-Miller and three other team members witnessed their supervisor, Steve, exhibit "favoritism" by tasking others on the Cap 1 team with "quick-and-easy assignments" while giving them "harder" tasks "that would . . . take the entire shift." *Id.* at 375, Tr. 43:6–18. In response, Mr. Sharpe-Miller and his three colleagues made a written complaint about Steve's perceived favoritism, and Mr. Sharpe-Miller gave it to Ivan Lujan and Lydia Riggins, the store's co-managers. There is no evidence that Steve's favoritism was tied to sexual orientation or any other protected trait.

In 2019, Mr. Sharpe-Miller requested and received another transfer, this time to the food sales team. His new supervisor, assistant manager Antoinette Morro, "joke[d] around about the fact that [Mr. Sharpe-Miller] had a cat walk," meaning that he "walked pretty femininely." *See id.* at 376, Tr. 48:19–25, 49:5–9, 20–25, 50:1–3. Jasmine Zamora, a Walmart employee who sometimes filled in for Ms. Morro, also commented on Mr. Sharpe-Miller's "cat walk" and "brought up that [his] hips sway a lot." *Id.* at 379, Tr. 59:9–13, 21–25, 60:1–18.

5

In the summer of 2019, Mr. Sharpe-Miller applied for and received a promotion to supervisor of the Cap 2 team, a position with responsibility over approximately 27 employees. Two minor twin brothers that reported to Mr. Sharpe-Miller would make limp-wrist gestures when he walked by.[2]

As the Cap 2 supervisor, Mr. Sharpe-Miller sometimes "butted heads" with the store manager, Mr. Lujan, because Mr. Sharpe-Miller told him that the Cap 2 team was being overworked. Aplt.'s App., Vol. II, at 386, Tr. 89:8–90:20. Eventually, Mr. Lujan and Thomas Mirelez (the assistant manager overseeing Mr. Sharpe-Miller) pulled him into an office and told him "that [his] work wasn't satisfactory, that they were going to demote [him], and [that he] could either take the demotion or [he] would be fired." *Id.* at 386, Tr. 87:17–22. Mr. Sharpe-Miller testified that Mr. Lujan and Mr. Mirelez "didn't really go . . . too much into detail about [his] demotion and the reasons," but he believed they "said that[] . . . when the market manager[3] had c[o]me down, he saw something that [Mr. Sharpe-Miller] did or something, and he didn't really like it." *Id.*, Tr. 88:10–22.

In any event, Mr. Sharpe-Miller was demoted in August 2019 to a non-supervisory position on the Online Grocery Pickup ("OGP") team with a lower wage. Two weeks after his demotion, Mr. Sharpe-Miller was again abruptly pulled into the office by

---

[2]    *See Limp-wristed*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/limp-wristed (last visited June 22, 2026) ("*disparaging*: effeminate"); *Limp wrist*, Dictionary.com, https://www.dictionary.com/browse/limp-wrist (last visited June 22, 2026) ("*Slang: Disparaging and Offensive*. a contemptuous term used to refer to an effeminate man, especially a gay man.").

[3]    Mr. Sharpe-Miller did not explain the identity or responsibilities of "the market manager."

managers, this time Ms. Riggins and Mr. Lujan, and told that he was under investigation for sexual harassment of the minor twin brothers who had worked for him in Cap 2. Mr. Sharpe-Miller testified that the managers told him that the brothers had reported him, "basically saying that [he] had tried to come on to them, that [he] was[] . . . flirting with them . . . and that [he] was . . . making inappropriate advances." *Id.* at 400, Tr. 143:1–4. Timothy Rocha, the human resources employee who received the verbal report from the twins and reported it to management, testified that the complaint was that Mr. Sharpe-Miller had told other employees that one of the twins was gay. Mr. Rocha testified that the brother in question "reassure[d] me that he was not [gay]." *Id.* at 451, Tr. 62:16–20 (Timothy Rocha Zoom Dep., dated May 9, 2023).

However, Mr. Sharpe-Miller had only interacted with the two brothers professionally, in his supervisory capacity. Yet he did recall having once given one of them a "verbal warning for not being where they were supposed to be." *Id.* at 400, Tr. 145:11–12. Mr. Sharpe-Miller, "flustered" and "blindsided" by the twins' accusation, "immediately denied" the allegation, *id.* at 399, Tr. 142:13–15, and "wrote [his] own statement," which he gave to Ms. Riggins and Mr. Lujan, *id.*, Tr. 141:23–24, 142:13–17. He never heard anything further about the investigation.

A lot of the younger males on the OGP team would use the slur "faggot . . . very commonly." *Id.* at 405, Tr. 165:3–11. Mr. Sharpe-Miller was called a "pedophile" by one OGP coworker. *Id.* at 416, Tr. 210:20–25. One day Mr. Sharpe-Miller saw a "really horrible" drawing on a markerboard in the OGP break room depicting a person with "Faggot" written in big capital letters across the forehead. *Id.* at 420, Tr. 223:19–25. The

drawing was up on the board for at least a couple of hours. When Mr. Sharpe-Miller spoke about the drawing with an OGP supervisor, Corina Lopez, "she basically kind of shrugged it off and said, Boys will be boys, and then she just erased it from the board." *Id.*, Tr. 223:13–14, 225:6–9.

In April of 2021, while working in OGP, Mr. Sharpe-Miller was summoned for jury duty. He noted his anticipated absence in Walmart's attendance system and took the day off work. When Mr. Sharpe-Miller returned on his next regularly scheduled work day later that week, his supervisor informed him that he had been terminated. Mr. Sharpe-Miller explained that he had properly reported his absence for jury duty, and when he escalated his protest to a co-manager, Enoc Carrera, Mr. Carrera "decided to reinstate" him. *See id.* at 389–90, Tr. 102:6–103:10. Mr. Sharpe-Miller believes that the termination did not cause him to work any days without pay.

During his employment, Mr. Sharpe-Miller also submitted various vacation requests, some of which were denied. When other employees later sent vacation requests for the same dates, the other employees' requests were approved.

On April 16, 2021, Mr. Sharpe-Miller submitted his two weeks' notice indicating his intent to resign from Walmart. He delivered a written notice to Mr. Rocha that read:

> Please accept this letter as my notice of resignation from Walmart, effective 04/16/2021 to 04/30/2021.
>
> The memories and lessons I've made and learned during my employment here will truly be memorable. I hope a two week notice is sufficient for you to find a replacement for me. If I can help to train my replacement or tie up any loose ends, please let me know.
>
> Thank you very much for the opportunity to work here.

8

Aplee.'s Suppl. App. at 268 (Resignation Letter, dated Apr. 16, 2021).

Mr. Sharpe-Miller resigned on April 30, 2021.

### B. Procedural History

On April 26, 2022, Mr. Sharpe-Miller brought this action against Walmart in New Mexico state court. The action was removed to federal court, and on November 15, 2022, Mr. Sharpe-Miller filed his operative first amended complaint ("the Complaint"). Relevant to this appeal are Count III, which alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e & 2000e-17, and Count II, which alleged violations of the NMHRA, N.M. STAT. ANN. §§ 28-1-1 *et seq.*, a state-law analog of Title VII. As framed by the parties and as delineated in the district court's later summary-judgment order, Counts II and III include disparate-treatment claims based on Mr. Sharpe-Miller's demotion and temporary firing, a retaliation claim, a hostile-work-environment claim, and a constructive-discharge claim.

After discovery, Walmart filed a motion for summary judgment on all of Mr. Sharpe-Miller's claims. Mr. Sharpe-Miller opposed the motion.

On December 28, 2023, the district court granted Walmart's motion for summary judgment. The court analyzed Mr. Sharpe-Miller's disparate-treatment claims under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and held that he had failed to provide evidence supporting a prima facie case of discrimination. The court also determined that even if Mr. Sharpe-Miller *had* established a prima facie case of discrimination, under the framework of *McDonnell Douglas*, Walmart "had legitimate, nondiscriminatory reasons for its adverse

9

employment actions." Aplt.'s App., Vol. II, at 310–11. The court further concluded that Mr. Sharpe-Miller had not shown that Walmart's stated reasons were pretextual.

The court also rejected Mr. Sharpe-Miller's constructive-discharge theory. It concluded that the treatment Mr. Sharpe-Miller experienced was not severe enough to be intolerable.

The court also granted summary judgment to Walmart on Mr. Sharpe-Miller's hostile-work-environment claim. The court disregarded many of the discriminatory acts that Mr. Sharpe-Miller testified to on various grounds: specifically, on the basis that the acts were unrelated to sexual orientation; the actors were unidentified; the acts were not directed at Mr. Sharpe-Miller; the acts did not interfere with Mr. Sharpe-Miller's work performance; the acts involved inadmissible hearsay; and discrete, independently actionable acts—namely, Mr. Sharpe-Miller's demotion, termination, and resignation—could not, as a matter of law, form part of a hostile-work-environment claim. The court then concluded that the remaining "discrimination alleged [wa]s not sufficiently severe or pervasive such that it altered the terms or conditions of his employment" because "the record d[id] not support a finding that Plaintiff suffered 'a steady barrage of opprobrious [] comments' that a reasonable person would find hostile or abusive." *Id.* at 314 (third alteration in original) (quoting *Nettle*, 334 F. App'x at 925).

The district court therefore concluded that Mr. Sharpe-Miller had "failed to establish a prima facie hostile work environment claim." *Id.* at 317. Furthermore, the court concluded that because Mr. Sharpe-Miller did not report much of the conduct he experienced to individuals in management positions, Mr. Sharpe-Miller had "not

established that Defendant knew or should have known about the conduct and failed to stop it." *Id.*

Finally, the district court granted summary judgment to Walmart on Mr. Sharpe-Miller's retaliation claim. The court held that Mr. Sharpe-Miller had not pointed to evidence supporting a prima facie case of retaliation because he had not shown that he engaged in "protected opposition to discrimination" such as complaining to a supervisor or filing a complaint with the EEOC. *Id.* at 319.

Thus, the district court granted Walmart's motion for summary judgment on all Mr. Sharpe-Miller's claims and dismissed the action with prejudice.[4]

On April 8, 2024, Mr. Sharpe-Miller timely appealed. The EEOC joined the appeal as an amicus curiae. The EEOC did not take a position on the ultimate issue of Walmart's liability, but it briefed perceived legal errors in the district court's disparate-treatment and hostile-work-environment analyses.

## II. Discussion

Mr. Sharpe-Miller challenges the district court's grant of summary judgment for Walmart on his Title VII and NMHRA claims for (1) disparate treatment based on his

---

[4]    On January 24, 2024, Mr. Sharpe-Miller filed a motion to alter or amend the judgment, which the district court denied on March 7, 2024. Mr. Sharpe-Miller repeats several times in his briefing that he is also seeking review of the district court's March 7 order. But he never discusses the substance of that order or engages with the district court's Rule 59(e) analysis. In fact, he does not cite Rule 59(e) or any case law applying the Rule 59(e) standard in either of his briefs. Accordingly, we deem any challenge that Mr. Sharpe-Miller could make to that order to be waived. *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1181 (10th Cir. 2023) (noting that "one also may waive appellate review of an issue by not arguing it—or arguing it in an inadequate manner—in one's opening brief").

demotion, (2) disparate treatment based on his temporary termination, (3) retaliation, (4) a hostile work environment, and (5) constructive discharge.  We reverse the district court's grant of summary judgment on Mr. Sharpe-Miller's hostile-work-environment claim and affirm as to the other claims.

## A. Standard of Review

"We review the district court's summary judgment decision de novo, applying the same [Rule 56] standards as the district court." *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017)).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also* 10A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2725.2 (4th ed.), Westlaw (database updated Apr. 2026) ("[A] party moving for summary judgment is not entitled to a judgment merely because the facts the party offers appear more plausible than those tendered in opposition, or because it appears that the [non-movant] is unlikely to prevail at trial.").  "[C]ourts are

required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

"It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1112 (10th Cir. 2009) (quoting *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000)). "[E]ven standing alone, self-serving testimony can suffice to prevent summary judgment." *Janny v. Gamez*, 8 F.4th 883, 901 (10th Cir. 2021) (quoting *Greer v. City of Wichita, Kan.*, 943 F.3d 1320, 1325 (10th Cir. 2019)).

### B. Mr. Sharpe-Miller's Disparate-Treatment Claims

Mr. Sharpe-Miller challenges the district court's grant of summary judgment on his disparate-treatment claims, which arise from his demotion and temporary termination. We affirm, because his demotion-based claim is time-barred, and he has waived his appellate challenge to the dismissal of his termination-based claim.

### 1. Legal Standards

Title VII[5] prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of

---

[5]      We follow the lead of the parties' briefing in analyzing Mr. Sharpe-Miller's various claims primarily under Title VII standards and treating that analysis as equally applicable to the corresponding claims under the NMHRA. That approach seems objectively sound and appropriate. For example, for purposes of Mr. Sharpe-Miller's disparate-treatment claims, it is undisputed that Title VII and the NMHRA employ the same standards. *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1296 (10th Cir. 2013)

such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This includes discriminating based on sexual orientation because "it is impossible to discriminate against a person for being homosexual . . . without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 660 (2020).[6]

Discrimination under Title VII can take several forms. "'Disparate treatment' . . . is the most easily understood type of discrimination." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). In a disparate-treatment case, "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Id.* "Proof of discriminatory motive is critical" to such a claim. *Id.* A plaintiff can prove discriminatory motive by direct evidence, but that often does not exist. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) ("[T]here will seldom be 'eyewitness' testimony as to the employer's mental processes[] . . . ." (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). Alternatively, a plaintiff can prove discriminatory intent with circumstantial evidence under the burden-shifting framework articulated in *McDonnell Douglas*, 411 U.S. 792.

---

("The New Mexico Human Rights Act sets out the same standard for establishing wrongful discrimination as Title VII does."). For the sake of completeness or emphasis, however, we make note on occasion of congruencies between the two statutes, citing New Mexico case law interpreting the NMHRA.

[6] The NMHRA explicitly prohibits discriminating based on sexual orientation. N.M. STAT. ANN. § 28-1-7(A).

Under *McDonnell Douglas*, a plaintiff may meet his initial burden by showing that "(1) [he] belongs to a protected class; (2) [he] suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). If a plaintiff provides evidence to support these elements, the burden shifts to the employer to offer evidence of a legitimate, nondiscriminatory reason for the adverse action. *Id.*; *accord McDonnell Douglas*, 411 U.S. at 802. "If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *PVNF*, 487 F.3d at 800. That does not mean that the plaintiff must show that the employer's proffered reasons played *no* role in the adverse action. *See Bostock*, 590 U.S. at 659 ("It doesn't matter if other factors besides the plaintiff's [protected trait] contributed to the decision."). Rather, the plaintiff's ultimate burden is to show that the adverse action was at least "based in part" on his protected trait. *Id.*

An adverse employment action is an action that affects "a term, condition, or privilege of employment," *Hishon v. King & Spalding*, 467 U.S. 69, 77 (1984), and that causes the employee "some harm," *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 350 (2024). The plaintiff need not show that the harm was substantial, significant, or material. *Id.*; *accord Scheer v. Sisters of Charity of Leavenworth Health Sys., Inc.*, 144 F.4th 1212, 1216 (10th Cir. 2025).

## 2. Analysis

### a. Demotion-Based Disparate Treatment

Mr. Sharpe-Miller challenges the district court's grant of summary judgment on his disparate-treatment claim arising from his demotion. Walmart responds that any claim based on Mr. Sharpe-Miller's demotion is time-barred, and that he failed to show that Walmart's stated reason for his demotion was pretextual. We conclude that Mr. Sharpe-Miller's disparate-treatment claim based on his demotion is time-barred under both 42 U.S.C. § 2000e-5(e)(1) and N.M. STAT. ANN. § 28-1-10(A).

### i. Preservation

We first assess whether Walmart's statute-of-limitations argument is properly before us. The district court did not evaluate whether Mr. Sharpe-Miller's discriminatory demotion claim was time-barred. Walmart argues that it nonetheless made its time-bar argument before the district court. Walmart cites a statement it made in its answer to Mr. Sharpe-Miller's first amended complaint. *See* Aplt.'s App., Vol. I, at 141 (Def. Walmart, Inc.'s Ans. to Pl.'s First Am. Compl., filed Nov. 30, 2022) ("DEFENSES . . . 98. Plaintiff's claims are barred by the applicable statute of limitations." (bold-face font and underline omitted)).

We conclude that Mr. Sharpe-Miller waived any waiver by Walmart of its statute-of-limitations defense. An argument that a claim is barred by a statute of limitations is an affirmative defense. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018). Accordingly, it must be affirmatively raised and argued by a defendant during the litigation. *Id.* at 1298–99. Even assuming that Walmart's

16

generalized reference in its answer to statutes of limitations was insufficient to raise and argue the defense, Mr. Sharpe-Miller did not raise the potential preservation defect in his briefing. Instead, he only engages with the merits of Walmart's limitations argument. *See* Aplt.'s Reply Br. at 16–17. It is the parties' role to raise and brief the issues for decision, not ours. *See In re Syngenta AG MIR 162 Corn Litig. (Hossley-Embry Grp. II)*, 111 F.4th 1095, 1112 (10th Cir. 2024). That principle also applies to questions of waiver and forfeiture, so we ordinarily do not raise them sua sponte. *See*, *e.g.*, *Nelson v. United States*, 40 F.4th 1105, 1111 n.2 (10th Cir. 2022). Seeing no reason to depart from that standard practice, we consider the merits of Walmart's limitations argument.

### ii. Statutes of Limitations

Title VII and the NMHRA require that claims be brought within 180 or 300 days of the offending action, depending on the circumstances. *See* 42 U.S.C. § 2000e-5(e)(1); N.M. STAT. ANN. § 28-1-10(A). Mr. Sharpe-Miller contends that his demotion fell within an exception to those statutes of limitations because it was part of one continuing violation, other parts of which occurred within the applicable limitations period. This argument is misguided.

As the district court characterized his claims—a characterization that, significantly, Mr. Sharpe-Miller does not dispute on appeal—Mr. Sharpe-Miller alleged that Walmart violated Title VII and the NMHRA in several independent ways: by demoting him, by terminating him, by constructively discharging him, by subjecting him to a hostile work environment, and by retaliating against him. Mr. Sharpe-Miller suggests that his demotion is one part of his hostile-work-environment claim. *See* Aplt.'s

17

Opening Br. at 47; Aplt.'s Reply Br. at 18.  But Walmart's limitations argument has *not* placed the bull's eye on this hostile-work-environment claim; rather it is directly aimed at Mr. Sharpe-Miller's separate disparate-treatment claim based on his demotion. *See* Aplee.'s Resp. Br. at 22.  As we discuss below, the exception that Mr. Sharpe-Miller invokes is inapposite as to that disparate-treatment claim.  The upshot is that Mr. Sharpe-Miller's  disparate-treatment claim stemming from his demotion is time-barred.

To explain, under Title VII and the NMHRA, there are different accrual rules for claims based on discrete acts of discrimination and claims—like hostile-work-environment—based on cumulative discriminatory acts.  Specifically, in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that acts occurring outside the statutory limitations period for Title VII could still be alleged and evaluated as part of a timely hostile-work-environment claim provided that other acts making up the claim occurred within the statutory limitations period.  *See id.* at 105.  The Court contrasted the "repeated conduct" making up a hostile-work-environment claim with "a discrete retaliatory or discriminatory act"; any Title VII claim based on a single discrete act generally accrues on the day of that act.  *See id.* at 110, 115.  The New Mexico Supreme Court later adopted this approach for the NMHRA.  *See Ulibarri v. State of N.M. Corr. Acad.*, 131 P.3d 43, 48 (N.M. 2006).

If his hostile-work-environment claim were at issue here, Mr. Sharpe-Miller's limitations argument conceivably would find support in *Morgan*'s rule for claims involving cumulative discriminatory acts because he suggests that his demotion was one act amongst other discriminatory acts making up his hostile-work-environment claim.

18

And, significantly, Walmart does not argue that the hostile-work-environment claim itself is time-barred. But that is not the state of play. Walmart's limitations argument focuses on Mr. Sharpe-Miller's independent, disparate-treatment claim that challenges his demotion. That discrete violation "occurred" on the day Mr. Sharpe-Miller was demoted, sometime in 2019. *See Morgan*, 536 U.S. at 110. And the federal and New Mexico statutes of limitations started to run for this discrete-act claim that day—that is, on the day of the adverse action of demotion—and expired 180 or 300 days thereafter, sometime in October 2020 at the very latest. Yet Mr. Sharpe-Miller brought this action against Walmart in 2022. Accordingly, it ineluctably follows that Mr. Sharpe-Miller's disparate-treatment claim based on his demotion is time-barred.

We therefore affirm the district court's grant of summary judgment as to Mr. Sharpe-Miller's disparate-treatment claim based on his demotion, albeit on a different ground than the district court. *See, e.g.*, *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1255 (10th Cir. 1997) (explaining in evaluating statute-of-limitations defense as alternative ground for affirmance that "[t]his court may affirm the decision of the district court for any reason supported by the record below").

### b. Termination-Based Disparate Treatment

Mr. Sharpe-Miller also challenges the district court's grant of summary judgment for Walmart on his disparate-treatment claim arising from his brief termination. At bottom, he contends that the district court should not have found that Walmart met its burden under step two of *McDonnell Douglas* to establish a nondiscriminatory reason for his termination. He also contends that he presented evidence sufficient to satisfy step

19

three of *McDonnell Douglas*. We conclude that he has waived his challenge by not addressing one of the grounds on which the district court disposed of this claim—whether his termination, which was promptly fixed, was an adverse employment action at all.

The district court held that Mr. Sharpe-Miller did not provide evidence supporting a prima facie case on multiple grounds, reasoning in part that his termination was not an adverse employment action. The district court based that holding on the fact that Walmart "almost immediately" restored Mr. Sharpe-Miller's employment and that he did not work any days without pay. Aplt.'s App., Vol. II, at 309. In its response brief, Walmart embraces the district court's conclusion: "Plaintiff testified he was reinstated on the same day and was compensated for all time worked while not yet back in Walmart's payroll system. Thus, Plaintiff's temporary termination does not constitute an adverse employment action." Aplee.'s Resp. Br. at 29. In support, Walmart cites *Muldrow*.

Mr. Sharpe-Miller's briefing does not challenge the district court's conclusion that his termination was not an adverse employment action. In particular, he fails to address the court's reasoning that he was promptly reinstated and never worked without pay. This failure is fatal to his challenge.

*Muldrow* dispensed with some courts' gloss on Title VII that adverse employment actions must cause substantial or material harm. 601 U.S. at 350. But the Court maintained that the plaintiff must still show "some harm." *Id.* ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees." (quoting *Bostock*, 601 U.S. at 354)). This harm requirement was one of the grounds on

20

which the district court disposed of Mr. Sharpe-Miller's termination-based disparate-treatment claim.

Accordingly, Mr. Sharpe-Miller therefore had to engage with that issue to prevail. *See Rsrv. Mech. Corp. v. Comm'r of Internal Revenue*, 34 F.4th 881, 913 (10th Cir. 2022) ("When a district court dismisses a claim on two or more independent grounds, the appellant must challenge each of those grounds." (quoting *Lebahn v. Nat'l Farmers Union Unif. Pension Plan*, 828 F.3d 1180, 1188 (10th Cir. 2016)); *accord United States v. Wells*, 38 F.4th 1246, 1262 n.12 (10th Cir. 2022). He did not do so. We therefore affirm the district court's grant of summary judgment as to his disparate-treatment claim arising from his termination.

### C. Mr. Sharpe-Miller's Retaliation Claim

Mr. Sharpe-Miller next challenges the district court's grant of summary judgment for Walmart on his retaliation claim. Walmart defends the district court's determination that Mr. Sharpe-Miller could not establish a prima facie case of retaliation. We hold that Mr. Sharpe-Miller has not shown that he engaged in a protected activity, so he has not established one of the prima facie elements of a Title VII retaliation claim.

### 1. Legal Standards

"Under Title VII, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by [Title VII].'" *Iweha v. Kansas*, 121 F.4th 1208, 1233 (10th Cir. 2024) (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). "To establish a prima facie case of retaliation, a plaintiff must prove '(1) [he] engaged in protected activity; (2) [he] suffered an adverse

employment action; and (3) there was a causal connection between the protected activity and the adverse action.'" *Id.* (quoting *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008)).

"The 'protected activity' refers to the plaintiff's 'protected opposition to discrimination' made illegal under Title VII." *Id.* (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015)). "An employee's '[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors.'" *Id.* (alteration in original) (quoting *Hertz*, 370 F.3d at 1015). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]. General complaints about company management . . . will not suffice." *Id.* at 1233–34 (alterations in original) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).

### 2. Analysis

Mr. Sharpe-Miller's retaliation claim fails because he points to no evidence that he engaged in "protected opposition to discrimination." *Iweha*, 121 F.4th at 1233 (quoting *Lounds*, 812 F.3d at 1233). He references several communications that he argues are protected opposition, but they are not. First, Mr. Sharpe-Miller alleges that he made "complaints of favoritism in job assignments to manager Steve." Aplt.'s Opening Br. at 10–11 (bold-face font omitted) (citing Aplt.'s App., Vol. II, at 375). He testified that he "wrote a statement along with" three of his team members to complain that Steve gave others better work assignments. Aplt.'s App., Vol. II, at 375, Tr. 43:6–18. But

Mr. Sharpe-Miller points to no evidence that this was a complaint about conduct prohibited by Title VII. Therefore, a jury could not infer that the statement was protected opposition. *See, e.g.*, *Byrnes v. St. Catherine Hosp.*, 158 F.4th 1107, 1114 (10th Cir. 2025) (noting that a plaintiff must demonstrate that "[he] engaged in protected opposition to discrimination" (alteration in original) (quoting *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019))).

Mr. Sharpe-Miller also points to his written response to the sexual harassment investigation that Walmart initiated against him. However, Mr. Sharpe-Miller testified that he "c[ouldn't] really recall everything that [he] put in [his response] besides denying the allegations." *Id.* at 400, Tr. 144:11–16. He suggests that the investigation was falsely instigated as yet another discriminatory act, noting that the complainant had made limp-wrist gestures toward him. But the question is not merely whether Mr. Sharpe-Miller opposed an investigation that may have resulted from discriminatory animus. To qualify as protected opposition, his response would have needed to *communicate* his concern that the investigation was driven by discriminatory animus. *See Iweha*, 121 F.4th at 1233–34 ("[T]he employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]." (alteration in original) (quoting *Hinds*, 523 F.3d at 1203)). A jury could not reasonably find that Mr. Sharpe-Miller's investigation response was protected opposition.

Lastly, Mr. Sharpe-Miller points to Mr. Lujan's and Mr. Mirelez's threat that he would be fired if he did not accept his demotion. However, Mr. Sharpe-Miller's precise testimony was that his supervisors told him "they were going to demote [him], and [he]

23

could either take the demotion or [he] would be fired.  And, well, [he] took the demotion."  Aplt.'s App., Vol. II, at 386, Tr. 87:17–24.  The fact that Mr. Sharpe-Miller did not respond to this alleged threat with any opposition means that Title VII's retaliation provision does not apply.  *See* 42 U.S.C. § 2000e-3(a) (making it unlawful to "discriminate against . . . employees . . . because [the employee] *has opposed* any practice" prohibited by Title VII (emphasis added)); *Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1339 (10th Cir. 2025) ("'The term "oppose,"' in Title VII 'carries its ordinary meaning: to resist or antagonize; to contend against; to confront; resist; withstand.'" (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)).  This testimony does not show Mr. Sharpe-Miller engaging in protected opposition.

Mr. Sharpe-Miller does note that this demotion occurred "very shortly after 'butting heads'" with his supervisor.  Aplt.'s Opening Br. at 54 (quoting Aplt.'s App., Vol. II, at 386).  However, Mr. Sharpe-Miller testified that the substance of this dispute was the supervisor overworking Mr. Sharpe-Miller's team.  There is no evidence that Mr. Sharpe-Miller had complained to that supervisor about any discrimination.

In sum, Mr. Sharpe-Miller has not shown that he engaged in protected opposition, so he cannot make out a prima facie case of Title VII or NMHRA retaliation.  The district court therefore properly granted summary judgment on his retaliation claim.

### D. Mr. Sharpe-Miller's Hostile-Work-Environment Claim

Next, Mr. Sharpe-Miller challenges the district court's grant of summary judgment to Walmart on his hostile-work-environment claim.  He argues that the district court

24

disregarded or discounted various instances of sexual-orientation harassment and incorrectly determined that knowledge of the harassment could not be imputed to Walmart. Although the EEOC does not take a position on Walmart's liability, it argues that the district court committed several legal errors in analyzing this claim. Walmart defends the district court's analysis and argues that Mr. Sharpe-Miller's evidence does not add up to a hostile work environment.

Viewing the evidence in the light most favorable to Mr. Sharpe-Miller, as we must, we respectfully disagree with the district court's assessment of several instances of alleged discrimination and with its statement of the hostile-work-environment standard. Ultimately, we conclude that Mr. Sharpe-Miller provided enough evidence of anti-gay discrimination in his workplace to support a hostile-work-environment claim. Furthermore, there also is sufficient evidence that supervisors knew of enough harassment for a reasonable jury to find that Walmart knew or should have known of the hostile work environment. Accordingly, we reverse the district court's grant of summary judgment to Walmart on this claim.

### 1. Legal Standards

"[A]lthough [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition "'is not limited to 'economic' or 'tangible' discrimination,'"" and . . . it covers more than "'terms" and "conditions" in the narrow contractual sense.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (first quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); and then quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). "'The phrase "terms,

conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment . . ." in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). "An employer creates a hostile work environment when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Iweha*, 121 F.4th at 1221 (quoting *Hall v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 478 F.3d 847, 851 (10th Cir. 2007)).

"Our precedent reveals no talismanic number of incidents needed to give rise to a hostile[-work-environment] claim." *Id.* (quoting *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1143 (10th Cir. 2008)). "A plaintiff must prove that their work environment was both 'objectively and subjectively hostile.'" *Id.* (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012)). "Proof of either severity *or* pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Id.* (quoting *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021)). "[W]hether conduct qualifies as severe or pervasive is 'particularly unsuited for summary judgment because it is quintessentially a question of fact.'" *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1228 (10th Cir. 2022) (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 958 (10th Cir. 2012)). Rather, "the question is whether [the employee] has carried h[is] burden on summary judgment to create a jury question relating to whether the alleged harassment was sufficiently pervasive or severe." *Lounds*, 812 F.3d at 1221.

## 2. Analysis

### a. Existence of a Hostile Work Environment

The district court committed two errors in concluding that no rational jury could find that Walmart subjected Mr. Sharpe-Miller to a hostile work environment. Specifically, the district court mistakenly excluded or discounted multiple relevant discriminatory acts. And it relied on an incomplete statement of the law when it stated that a hostile-work-environment claim can only succeed if the plaintiff is subjected to a "steady barrage" of discrimination. Factoring in the discriminatory acts that the district court factored out and taking account of the fact that, under certain circumstances, a smaller number of discriminatory acts can create a hostile work environment, we conclude that a rational jury could find that Walmart created a hostile work environment.

### i. Disregard of Relevant Discriminatory Acts

Mr. Sharpe-Miller argues that the district court disregarded or discounted various instances of sexual-orientation harassment. Having studied the district court's order, we conclude that the court made several errors of that sort which undermine the persuasiveness and legal soundness of its analysis.

### aa. Comments Related to Sexual Orientation

The district court agreed with Walmart that Mr. Sharpe-Miller was not "able to establish that [several] comments were related to his sexual orientation," namely Ms. Zamora and Ms. Morro joking about his "cat walk," Mr. Spicer asking if he was "afraid to break a nail," and an unidentified coworker calling him "Jerry the fairy."

Aplt.'s App., Vol. II, at 314 (citing Aplt.'s App., Vol. I, at 217 (Def. Walmart, Inc.'s Mot. for Summ. J., filed Oct. 13, 2023)).  We believe that the district court was mistaken.

More specifically, Mr. Sharpe-Miller expanded on the significance of the "cat walk" comments, stating that Ms. Zamora would bring up that his hips swayed a lot and that Ms. Morro stated that he "walked pretty femininely."  *Id.* at 376, Tr. 50:1–3. Mr. Spicer's afraid-to-break-a-nail comment needs no additional context for a jury to reasonably perceive an anti-gay message, i.e., that Mr. Sharpe-Miller is embarrassingly weak or effeminate for a man.  And a quick dictionary check allows us to decode "Jerry the fairy."  *See Fairy,* MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/fairy (last visited June 22, 2026) ("*slang, offensive*: a gay person—used as a term of abuse and disparagement").  On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmovant. Here that means interpreting plausibly homophobic comments as homophobic.

Besides, our case law makes clear that "[f]acially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct." *Hernandez*, 684 F.3d at 960 (first alteration in original) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)).  Accordingly, even if the incidents the court disregarded were not overtly linked to Mr. Sharpe-Miller's sexual orientation, they may still contribute to a viable hostile-work-environment claim.

### bb. Comments by Unidentified Speakers

The district court disregarded several comments because Mr. Sharpe-Miller did not identify the speaker. It is unclear from the district court's opinion whether it viewed identifying the speaker of each comment as a legal requirement or a factor undermining Mr. Sharpe-Miller's credibility. Either would be error. Legally, identifying the declarant of each insult or slur is not necessary for it to contribute to a hostile work environment. *See Ford*, 45 F.4th at 1232 (rejecting the argument that "generalized testimony about sexual banter, not anchored in time or place, or attributed to any particular speaker[,] cannot support a hostile work environment" (quoting Resp. Br. at 44)); *cf. Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1311–14 (10th Cir. 2005) (entertaining hostile-work-environment claim alleging, *inter alia*, several *anonymous* discriminatory acts); *accord Tademy*, 614 F.3d at 1148–49; *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015). What matters for each insult to be legally relevant is that it comes from a coworker. *Cf. Harris*, 510 U.S. at 22 (focusing inquiry on whether "the [work] environment would reasonably be perceived, and is perceived, as hostile or abusive"). And that much is clear, or at least inferable, from Mr. Sharpe-Miller's testimony. *See, e.g.*, Aplt.'s App., Vol. II, at 397, Tr. 134:13–22 ("Q. . . . [Y]our complaint alleges that . . . [you were] called 'Jerry, the fairy,' by a still-unknown coworker overheard coming from the GM back room. . . . [Y]ou don't know who made that comment, correct? A. . . . I don't know who it was. And I heard it in passing *when I was leaving the GM back room*." (emphasis added)); *id.* at 419, Tr. 219:17–20 ("As to who it was *on my team* . . . , I don't really know." (emphasis

29

added)).  Mr. Sharpe-Miller's inability to name individual speakers behind comments is of course fair game for testing his memory or credibility on cross-examination, but that must wait for trial.

### cc. Comments Not Directed at Mr. Sharpe-Miller

Relatedly, the district court stated that "Plaintiff admitted that several of these derogatory comments were not directed at him." Aplt.'s App., Vol. II, at 316.  The court did not explicitly state whether that merely affected the severity of those comments or excluded them from the analysis.  The fact that a discriminatory comment is directed at the plaintiff may increase its severity. *See Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022).  But lest there be any doubt, discrimination "directed at others—who are *not* the plaintiff—is relevant [to the hostile-work-environment] analysis." *Ford*, 45 F.4th at 1232 (emphasis added); *see also Hernandez*, 684 F.3d at 959 ("[W]e have held that derogatory comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment.").

Relatedly, we have cautioned courts against focusing on the harasser's intent to offend the plaintiff, instead of focusing on the effect on the work environment. *Lounds*, 812 F.3d at 1232 ("[T]he district court committed legal error by focusing on whether the alleged harassers intended to be offensive or to cause harm—especially to Ms. Lounds— rather than on whether a reasonable jury could find . . . that the . . . *effect* of their conduct was to pollute the environment with harassing conduct that was, *inter alia*, racially humiliating, offensive, or insulting." (emphasis added)).  It is reasonable to infer that a

gay man would suffer when his coworkers deride gay men generally or use gayness as an insult.

### dd. Comments Not Interfering with Mr. Sharpe-Miller's Work Performance

The district court also stated that "the comments and incidents in question . . . do not appear to have interfered with Plaintiff's work performance." Aplt.'s App., Vol. II, at 315. Interference with work performance can be a relevant factor in assessing whether conduct qualifies as a hostile work environment. *See Harris*, 510 U.S. at 23. But this factor is far from dispositive, and "a victim's ability to succeed at her job in the face of harassment should not then mean that she has forfeited her right to bring a claim for hostile work environment." *Ford*, 45 F.4th at 1231. The hostile-work-environment theory is rooted in Title VII's text, which prohibits "discriminat[ion] . . . with respect to [an employee's] . . . conditions . . . of employment." 42 U.S.C. § 2000e-2(a)(1). Under this text, discriminatory work conditions are illegal regardless of whether an individual plaintiff permits such conduct to affect his or her work performance.[7]

### ee. Out-of-Court Comments

The district court also stated that "several derogatory comments [Mr. Sharpe-Miller] heard . . . cannot be considered by this Court" because "these comments are hearsay without an exception." Aplt.'s App., Vol. II, at 311.

---

[7] The effect on the plaintiff is relevant to establish the subjective component of a hostile-work-environment claim. However, Walmart does not contest that Mr. Sharpe-Miller subjectively perceived these incidents to have created a hostile work environment.

Mr. Sharpe-Miller argues that comments he heard are not hearsay because they are not offered for their truth. "'Hearsay' means a[n out-of-court] statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The district court did not specify which comments it considered inadmissible. However, we would be hard pressed to conclude that any derogatory comments Mr. Sharpe-Miller testified to hearing firsthand were offered for their truth and therefore qualified as hearsay. For example, the fact that coworkers used language including "faggot," "butt pirate," and "Jerry the fairy" were certainly not offered by Mr. Sharpe-Miller to prove that he or anyone else accurately fit that description. These slurs and insults contribute to a hostile work environment *because they were said*, not because they were accurate.

### ff. Discrete Acts (Demotion, Termination, and Resignation)

Lastly, we disagree with the district court's conclusion that "discrete acts" like Mr. Sharpe-Miller's demotion must be excluded from the hostile-work-environment analysis. The district court observed that "the Tenth Circuit has not explicitly addressed this question," but relying on two extra-circuit cases from federal courts of appeals,[8] the

---

[8]    The district court also gave prominence in its citation of authorities to a report and recommendation from a U.S. magistrate judge, which had been adopted by the district court in the U.S. District Court for the District of Colorado. *See* Aplt.'s App., Vol. II, at 317 (citing *Nicewonder v. Ferguson Enters., LLC*, No. 22-CV-01062-CMA-KLM, 2023 WL 1466828 (D. Colo. Feb. 2. 2023)). Whatever the merits of that decision, it certainly does not have binding effect on us or any other circuit. Therefore, exercising our discretion, we decline to address it further.

court determined that "a defendant's discrete acts of demotion and termination and a plaintiff's resignation cannot form part of a hostile work environment claim." Aplt.'s App., Vol. II, at 317 (first citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016); and then citing *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011)) .

The district court appears to be correct that the question of whether discrete, independently actionable discriminatory acts can form a part of hostile-work-environment claims is a matter of first impression in our circuit. However, we believe that the district court erred in answering the question in the negative.[9]

The Supreme Court's opinion in *Morgan* is instructive. Though the Court's primary focus there was the operation of the statute of limitations in the Title VII context, in our view, the Court at least suggested that each discriminatory act in a hostile work environment—whether or not amounting to a discrete, independently actionable discriminatory act—can constitute an element of a hostile-work-environment claim.

Specifically, the Court in *Morgan* analyzed when the statute of limitations for discrete-act and hostile-work-environment claims expires; in doing so, it contrasted discrete-act claims from hostile-work-environment claims. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision

---

[9]    The EEOC's amicus brief has adopted the same view that we do. *See* EEOC Amicus Br. at 27–28 ("While this Court has not directly addressed this issue, Supreme Court precedent and case law from several other circuits support the conclusion that discrete discriminatory acts can form part of a hostile-work-environment claim.").

constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. On the other hand, "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts." *Id.* at 115; *see also id.* at 117 (noting that "the entire hostile work environment encompasses a single unlawful employment practice"). The Court stated that "[i]n determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances.'" *Id.* at 116. Addressing whether such a claim could rest in part on conduct occurring before the limitations period, the Court stated that "[t]he statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability." *Id.* at 118.

The Court's discussion in *Morgan*—especially, its totality-of-the-circumstances approach to hostile-work-environment claims—at least suggests that the Court recognizes that each discriminatory act in a hostile work environment—irrespective of whether it amounts to a discrete, independently actionable discriminatory act—can constitute a substantive part of a hostile-work-environment claim. The Supreme Court later crystallized and validated this suggestion in *Green v. Brennan*, 578 U.S. 547 (2016).

Specifically, the *Green* Court described *Morgan* as having held that "a hostile-work-environment claim is a single 'unlawful employment practice' that includes every act composing that claim, *whether those acts are independently actionable or not.*" *Id.* at 557 (emphasis added). To be sure, *Green*, like *Morgan*, was primarily focused on resolving a limitations question—in *Green*, one involving constructive discharge—as

34

opposed to opining on the substantive content of hostile-work-environment claims.

Furthermore, the *Green* Court's descriptive language concerning *Morgan* was brief.[10]

But that language was pellucid.  And we believe that, at the very least, this language

provides significant support for the view that—starting with *Morgan* and continuing

through *Green*—the Supreme Court has effectively held that discrete, independently

actionable discriminatory acts can be part of a hostile-work-environment claim.

Remarkably, far from supporting the district court's contrary position, the two

sister-circuit decisions that the district court cited undercut it.  Expressly taking its cues

from *Morgan*, as "clarified" by *Green*, the Fourth Circuit in *Guessous* concluded that the

district court's "holding was in error"—a holding that is strikingly similar to the one that

the district court made here.  *Guessous*, 828 F.3d at 222–23.  Specifically, the Fourth

Circuit concluded that the district court erred in determining that discrete discriminatory

acts like termination were not cognizable elements of a hostile-work-environment claim

---

[10]    Indeed, *Green*'s description of *Morgan*'s holding only appears in a parenthetical appended to a citation to *Morgan*.  However, the Fourth Circuit in *Guessous* had no difficulty concluding that *Green* "clarified the holding in <u>Morgan</u>."  828 F.3d at 223.  Moreover, even if we were to conclude, in such circumstances, that *Green*'s description of *Morgan* is arguably dicta (which we do not), we are reminded that "we have previously held that 'we are "bound by Supreme Court dicta almost as firmly as by the Courts' [sic] outright holdings, particularly when the dicta is recent and not enfeebled by later statements."'"  *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (quoting *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007)).  We are not aware of any post-*Green* descriptions of *Morgan* by the Supreme Court that would undermine or weaken the one that *Green* offered.  Accordingly, despite the limited role that the *Morgan* description plays in *Green* itself, we would conclude, at the very least, that *Green*'s description of *Morgan* (even in isolation) offers significant guidance here in our resolution of the question of whether discrete, independently actionable discriminatory acts are proper elements of a hostile-work-environment claim.

because they were independently actionable. *See id.* In other words, the circuit court determined that the district court wrongly reasoned that "because such discrete acts are separately actionable, they cannot comprise part of a hostile work environment claim." *Id.* at 222.

> The *Guessous* court elaborated on its reasoning:

> > The Supreme Court [in *Green*] has recently explained that in a constructive-discharge case, the employee's resignation is the culmination of the intolerable discriminatory conduct of the employer, such that the relevant limitation period starts with the employee's resignation, not the last act of the employer. If a constructive discharge can be part and parcel of a discriminatory pattern of conduct, we see no reason that a discrete act cannot. So long as the act is part of the pattern of discriminatory treatment against the employee, then that act should be sufficient for purposes of the continuing-violation doctrine, *even if the act would otherwise qualify as a discrete act that is independently actionable.*

*Id.* at 223 (emphasis added) (citation omitted). Thus, rather than support the district court's order, *Guessous* fortifies our contrary conclusion that discrete, independently actionable discriminatory acts can be part of a hostile-work-environment claim.

The same can be said for the other circuit decision upon which the district court relied. In *Baird*, the district court signaled that the plaintiff was not free to include the same discriminatory and retaliatory acts upon which she based her independent claims for discrimination and retaliation as elements of her hostile-work-environment claim. *See Baird*, 662 F.3d at 1252. The D.C. Circuit rejected this suggestion:

> > [W]e find no authority for the idea that particular acts cannot as a matter of law simultaneously support different types of Title VII claims, and of course, plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct. Thus, although a plaintiff may not combine discrete acts to form a

36

hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own.

*Id.* Accordingly, notwithstanding the district court's reliance here on *Baird*, that case, like *Guessous*, undermines the district court's view that independently actionable discriminatory acts cannot be elements of a hostile-work-environment claim. As such, *Baird* aligns with our determination that the district court erred.

Furthermore, several of our sister circuits have reached similar conclusions. *See, e.g.*, *King v. Aramark Servs. Inc.*, 96 F.4th 546, 561 (2d Cir. 2024) ("When the Supreme Court described discrete act claims as 'different in kind' from hostile work environment claims, it did not suggest that the same discrete act could not support both kinds of claims if it is demonstrably part of the course of discriminatory treatment that comprises the hostile environment claim." (emphasis omitted) (quoting *Morgan*, 536 U.S. at 115)); *Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023) (noting that "[t]he district court misjudged which incidents could form the basis for [the plaintiff's] claim," because "[t]he court concluded that it could not consider any unexhausted discrete employment acts" (footnote omitted)); *Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) (noting, as to a hostile-work-environment claim based on sex, which involved discrete, independently actionable allegations of failure-to-promote and retaliation, that "[w]here the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim"); *see also*

37

*McNeal v. City of Blue Ash, Ohio*, 117 F4th 887, 902 n.15 (6th Cir. 2024) (collecting cases adopting this view).[11]

To be sure, like *Guessous* and *Baird*, many of these cases arise in limitations-related contexts, which harken back to and apply *Morgan* and its progeny. Consequently, it is at least arguable that their principal concern was not defining the substantive scope of hostile-work-environment claims, but instead determining whether such claims were timely. Indeed, the EEOC concedes that "[m]ost of these decisions have addressed the issue in the context of determining whether a non-time-barred discrete

---

[11]    The Ninth Circuit may have taken a different path. *See Porter v. Cal. Dep't of Corrs.*, 419 F.3d 885, 893 (9th Cir. 2005) ("If the flames of an allegedly hostile environment are to rise to the level of an actionable claim, they must do so based on the fuel of timely non-discrete acts."); *see also id.* at 893 n.4. ("Of course, discrete acts still may be considered for purposes of placing non-discrete acts in the proper context."). Even though the Ninth Circuit does not appear to have disavowed *Porter*, whether that decision definitively and comprehensively establishes the Ninth Circuit's position concerning inclusion in hostile-work-environment claims of discrete, independently actionable discriminatory acts is not entirely clear. *See, e.g.*, *Yonemoto v. Shinseki*, 3 F. Supp. 3d 827, 845 n.10 (D. Haw. 2014) ("Although bound by *Porter* to the extent it addresses the scope of discrimination and hostile work environment claims that are based on untimely events, the court recognizes that in other contexts, the Ninth Circuit has considered discrete acts as part of a hostile work environment claim. (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1108 (9th Cir. 2004)); *Beckmann v. Ito*, 430 F. Supp. 3d 655, 674–75 (D. Haw. 2020) (treating *Porter* as having been abrogated by Supreme Court's "description" of *Morgan* in *Green*, 578 U.S. 547). But insofar as *Porter* stands for the proposition that district courts must effectively or "literally divide the alleged discriminatory acts into two separate lists, one for discrete and one for non-discrete" acts, and then exclude the former from consideration in assessing the merits hostile-work-environment claims, *Porter* has drawn significant criticism. *Royal v. Potter*, 416 F. Supp. 2d 442, 450 (S.D. W. Va. 2006) (specifically analyzing *Porter*, and noting that "[t]his Court is not persuaded by the Ninth Circuit's application of *Morgan*"); *see Yonemoto,* 3 F. Supp.3d at 845 n.10 (noting that "*Porter* has been criticized to the extent it suggests that a hostile work environment claim must be based solely on non-discrete acts," and collecting cases suggesting as much).

act could 'rescue' an otherwise-time-barred hostile-work-environment claim or whether a time-barred discrete act could form part of a non-time-barred hostile-work-environment claim." EEOC Amicus Br. at 29 n.8.

However, there is nothing about these cases arising in limitations-related contexts that suggests that their reasoning is cabined to those contexts, and we conclude that they are capable of meaningfully informing our judgment on the question of whether discrete, independently actionable discriminatory acts can, as a categorical matter, be elements of a hostile-work-environment claim.

Moreover, it is notable that the Sixth Circuit has addressed the issue outside of a limitations-related context and concluded that discrete, independently actionable discriminatory acts can be, as a categorical matter, elements of hostile-work-environment claims. *See McNeal*, 117 F.4th at 902 n.14 ("[W]e recognize that a single discrete act may contribute to different types of harms. To the extent that a discrete act, on its own, causes a change in the terms and conditions of employment, it may be challenged in a disparate-treatment claim. However, when a discrete act also contributes to a different and continuing harm—for example, the pervasive humiliation of an employee—its ancillary impacts may be considered in a hostile-work-environment claim."); *id.* at 902 ("Whether a given act contributes to a hostile work environment does not turn on whether that act might support a separate claim."); *see also Kellar v. Yunion, Inc.*, 157 F.4th 855, 871 (6th Cir. 2025) ("Simply put, *McNeal* determined that precedent did not categorically prohibit courts from considering a separately actionable discrete act as conduct contributing to a hostile work environment; a closer analysis of the discrete act's impact

39

is necessary, as it might 'provide[] evidence of the environment of harassment . . . allege[d] in [a] hostile-work-environment claim.'" (alterations in original) (quoting *McNeal*, 117 F.4th at 901–03)).

Finally, even if we were addressing the question on a blank slate, we would struggle to see how the answer could be otherwise. The bedrock hostile-work-environment test is that "the workplace [must be] permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Morgan*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 21). If an employer engages in discrete, independently actionable conduct, such as demoting an employee, *as a means of discriminatory ridicule or insult*, that necessarily would contribute to a polluted, hostile work environment, just like discriminatory slurs and slights that, standing alone, may not be independently actionable. *Cf. McNeal*, 117 F.4th at 903 ("[E]ven if some of these disciplinary incidents were separately actionable, we would still consider whether the incidents were also weaponized as tools of harassment in the 'same actionable hostile work environment practice.'" (quoting *Morgan*, 536 U.S. at 120)).[12]

---

[12] Although the parties have not suggested that the outcomes that we reach in this opinion under Title VII would be different under the NMHRA on any issue, *see supra* note 4, because we address an issue of first impression in our circuit—that is, whether discrete, independently actionable acts of discrimination can form part of a hostile-work-environment claim under Title VII—and at least one court may have resolved that issue differently, *see supra* note 10, we highlight that this, too, appears to be an open question in New Mexico as to the NMHRA. And if called upon to render an *Erie* prediction, we would confidently predict that the New Mexico

\*\*\*

In sum, we conclude that the district court's order contains several errors that caused it to improperly discount or disregard alleged instances of discrimination relevant to whether a rational jury could find a hostile work environment.

### ii. Use of the "Steady Barrage" Formulation

Congruent with Mr. Sharpe-Miller's challenge to the district court's analysis, the EEOC argues that the district court legally erred insofar as it required Mr. Sharpe-Miller to demonstrate a "steady barrage" of discriminatory comments to prevail on his hostile-work-environment claim. Aplt.'s App., Vol. II, at 315 ("While this Court certainly does not condone these comments, gestures, or incidents, the record does not support a finding that these incidents formed a 'steady barrage' required for a hostile work environment claim."); *see* EEOC Amicus Br. at 26–27 (arguing that the district court's approach contravened our precedent's assessment of both the severity and pervasiveness of the discriminatory conduct); *see also* Aplt.'s Opening Br. at 56 (noting that "there is no magic number of harassing incidents"). We agree.

---

Supreme Court would answer that question as to the NMHRA, as we do as to Title VII. After all, in *Ulibarri*, the New Mexico Supreme Court embraced *Morgan*'s logic for purposes of the NMHRA's limitations period. 131 P.3d at 48; *see also id.* at 47 ("Unlike discrete acts, hostile environment cases involve repeated conduct over days or years and individual acts of harassment may not be separately actionable. Hostile environment claims are based on the cumulative effects of these acts, and these separate acts constitute a single unlawful employment practice: the practice of requiring an employee to work in a discriminatory, hostile or abusive environment."). And as we have explained, courts that have considered the question have overwhelmingly inferred from *Morgan* that a discriminatory act's independent actionability does not vitiate its contributions to a hostile work environment.

Several of our opinions could be read as suggesting that a hostile-work-environment claim requires a "steady barrage of opprobrious [discriminatory] comments," *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)).  However, "the language of an opinion is not always to be parsed as though we were dealing with language of a statute.'  Instead, . . . [judicial] opinions dispose of discrete cases and controversies and they must be read with a careful eye to context."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (first alteration in original) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)).  With the gloss of this "steady barrage" language, we never intended to divert our gaze from the foundational legal test that the Supreme Court has articulated: that is, whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris*, 510 U.S. at 21 (first quoting *Meritor Sav. Bank*, 477 U.S. at 65; and then quoting *id.* at 67).  Adopting a strict, literal construction of the "steady barrage" language and treating it as a uniform, frequency requirement—irrespective of the unique circumstances of particular cases—would be at odds with that foundational legal test.

Iweha offers a helpful, concise description of the analytical contours of this foundational test, which we have alluded to *supra*:

> "Proof of either severity *or* pervasiveness can serve as an independent ground to sustain a hostile work environment claim."  "[A] sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute."  Even as to the latter scenario of a

42

pattern of harassment, "there is a qualitative dimension to the pervasiveness inquiry (as well as the one for severity); logically, as relevant here, the workplace environment is likely to become more readily permeated by race-based [or nation origin-based] ridicule, insult, and the like, insofar as the repeated harassing acts approach the level of severe."

121 F.4th at 1221 (alterations and omissions in original) (first quoting *Throupe*, 988 F.3d at 1252; then quoting *Tademy*, 614 F.3d at 1144; and then quoting *Lounds*, 812 F.3d at 1223)); *see also Tademy*, 614 F.3d at 1143 ("Our precedent reveals no talismanic number of incidents needed to give rise to a hostile discrimination claim. . . . [W]hether a hostile environment claim is actionable depends not only on the number of incidents, but also on the severity of the incidents.").

Accordingly, under our precedent, the "steady barrage" formulation does not signal a uniform, frequency requirement or demand a ritualistic number-counting exercise. This formulation ordinarily will be a more relevant guidepost where the focus is on the pervasiveness of the discriminatory conduct. However, even then, we caution against overreading the frequency implied by the "steady barrage" phrasing. Our cases use the "steady barrage" language to contrast a scenario involving multiple, continual discriminatory incidents with a situation where an employee experiences only "sporadic" incidents. *See Iweha*, 121 F.4th at 1223 (quoting *Bolden*, 43 F.3d at 551); *see also Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1414 (10th Cir. 1997) ("[I]solated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct."). Furthermore, as the EEOC recognizes, even regarding pervasiveness, the assessment of whether incidents are sufficient to constitute a hostile work environment is a "qualitative"

43

one. *Lounds*, 812 F.3d at 1223 (noting that "there is a qualitative dimension to the pervasiveness inquiry"); *accord Iweha*, 121 F.4th at 1221; *see* EEOC Amicus Br. at 26 (noting that "this Court has adopted a 'qualitative' approach" to the pervasiveness inquiry (quoting *Lounds*, 812 F.3d at 1223)).

As explained below, Mr. Sharpe-Miller testified to instances of conduct that a reasonable jury could view—at the very least in the aggregate—as severe, including Mr. Jones's alleged comparison of homosexuality to pedophilia and bestiality, a coworker calling Mr. Sharpe-Miller a pedophile, and the break-room "FAGGOT" drawing. Accordingly, the "steady barrage" formulation ultimately does not provide a valuable guidepost for our analysis. However, it is important to clarify here that the district court apparently misunderstood the import of this formulation and applied it in an erroneous manner. For the reasons explicated below, we conclude that the district court erred in granting summary judgment to Walmart on Mr. Sharpe-Miller's hostile-work-environment claim.

### iii. De Novo Review of the Summary Judgment Evidence

We now assess de novo whether there is sufficient evidence to support a hostile-work-environment claim. We hold that there is. Mr. Sharpe-Miller's evidence shows a series of discriminatory acts that—in some instances individually, but certainly in the aggregate—could be found by a reasonable jury to be sufficiently severe to support his hostile-work-environment claim.

The work environment in *Tademy* is a helpful comparator. There we concluded that the African-American plaintiff's allegations were sufficient to allege "severe rather

44

than pervasive harassment" to support a hostile-work-environment claim. *Tademy*, 614 F.3d at 1144. The plaintiff found "the words 'nigger' and 'nigger go home,' etched on [his] locker," *id.* at 1145, and observed "two racist cartoons posted on company billboards," *id.* at 1136. Furthermore, there was an incident that left him "physically ill," *id.* at 1145; he saw "what appeared to be a life-size hangman's noose prominently suspended from a large industrial wall clock," *id.* at 1137.

Mr. Sharpe-Miller has testified to multiple highly offensive homophobic incidents. We recount some of the more salient ones here. Mr. Jones, an assistant store manager, asked Mr. Sharpe-Miller if a man he had seen Mr. Sharpe-Miller shopping with a few days before was Mr. Sharpe-Miller's partner. When Mr. Sharpe-Miller said that he was not, Mr. Jones responded, "[G]ood—if homosexuals got any more rights, . . . we might as well legalize pedophilia and bestiality." Aplt.'s App., Vol. II, at 415, Tr. 203:3–13.

Mr. Spicer and another employee, Emilio, used the terms "'faggot' [and] 'butt pirate' on a regular basis." *Id.* at 415, Tr. 204:5–22. Mr. Sharpe-Miller testified that he overheard another, unknown coworker call him "Jerry, the fairy." *Id.* at 397, Tr. 134:13–22. When Mr. Sharpe-Miller worked in food sales, his supervisor, Ms. Morro, "joke[d] around about the fact that [he] had a cat walk," meaning that he "walked pretty femininely." *See id.* at 376, Tr. 49:5–9, 20–25, 50:1–3. Ms. Zamora, who filled in for Ms. Morro at times, "ma[d]e a couple of comments mainly about [Mr. Sharpe-Miller's] cat walk, like [Ms. Morro] mentioned. She also brought up that [his] hips sway a lot." *Id.* at 379, Tr. 59:9–13, 21–25, 60:1–18.

The twin brothers who reported Mr. Sharpe-Miller for sexual harassment would make limp-wrist gestures when he walked by. *Id.* at 403, Tr. 157:9–16. Although the twins' complaint was that Mr. Sharpe-Miller had told other employees that one of them was gay, Mr. Sharpe-Miller was told by the store's managers that he had been accused of "tr[ying] to come on to them." *Id.*, at 399–400, Tr. 142:18–25, 143:1–4. Mr. Sharpe-Miller was "called [a] 'pedophile' by another coworker." *Id.* at 416, Tr. 210:16–25. Moreover, "[i]n April of 2020 through April of 2021, the word 'faggot' became a very commonly used word in the OGP back room[] . . . ." *Id.* at 405, Tr. 165:3–11.

Finally, and critically, during his time working on the OGP team, Mr. Sharpe-Miller witnessed a "really horrible" image drawn on the marker board in the OGP breakroom of "someone on [the] team," with the word "'Faggot' in big capital letters across the forehead." *Id.* at 420, Tr. 223:14–25.

In addition to the explicitly homophobic harassment recounted above, Mr. Sharpe-Miller alleges facially neutral incidents that could bolster his hostile-work-environment evidence in context. *See Hernandez*, 684 F.3d at 960 ("[F]acially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct." (quoting *O'Shea*, 185 F.3d at 1097)). In this regard, we note Mr. Sharpe-Miller's testimony that when he was demoted, his managers conveyed that he would be fired if he did not just "take the demotion." Aplt.'s App., Vol. II, at 386. Moreover, we especially highlight that the sexual harassment

46

investigation was allegedly instigated by false allegations by subordinates who had repeatedly mocked Mr. Sharpe-Miller for being gay.  These incidents do not obviously or explicitly reflect discrimination against Mr. Sharpe-Miller based on his sexual orientation.  However, a reasonable jury could nevertheless find that these negative actions—when viewed in the context of the overtly discriminatory acts polluting the environment—bolstered Mr. Sharpe-Miller's hostile-work-environment claim.  More specifically, even where the role of discriminatory animus in individual hostile episodes is inconclusive, such animus can sometimes become more apparent when the episodes are viewed together and in the context of substantial, overtly discriminatory harassment.

In conclusion, Mr. Sharpe-Miller provided sufficient evidence of anti-gay discrimination in his workplace, including several severe acts of discrimination, such that a reasonable jury could conclude that the harassment "alter[ed] the conditions of [his] employment and create[d] an abusive working environment."  *Harris*, 510 U.S. at 21 (emphasis added) (quoting *Meritor Sav. Bank*, 477 U.S. at 67).

### b. Walmart's Knowledge of the Hostile Work Environment

The district court also erred in concluding that because Mr. Sharpe-Miller did not report much of the conduct he experienced to individuals in management positions, Mr. Sharpe-Miller had "not established that Defendant knew or should have known about the conduct and failed to stop it."  Aplt.'s App., Vol. II, at 317.

"We have identified three bases . . . for holding an employer liable for hostile work environment based on a supervisor's or co-workers' . . . harassment: (1) where the conduct occurred within the transgressor's scope of employment, (2) *where the employer*

47

*knew, or should have known, about the violation and failed to respond in a reasonable manner*, or (3) where the transgressor acted with apparent authority or was aided by the agency relation." *Ford v. West*, 222 F.3d 767, 775–76 (10th Cir. 2000) (emphasis added); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 448–49 (2013) (explaining that, where the harassment creating a hostile work environment comes from a non-supervisor, "a plaintiff [can] prevail by showing that his or her employer was negligent in failing to prevent [the] harassment from taking place").

Mr. Sharpe-Miller testified that multiple Walmart supervisors actively contributed to the hostile work environment. For example, a Walmart supervisor, Ms. Morro, was one of the individuals who mocked Mr. Sharpe-Miller for walking in a feminine manner. Mr. Jones, an assistant manager, compared homosexuality to bestiality and pedophilia. Moreover, in what strikes us as one of the most troubling and severe instances of harassment—the "Faggot" drawing in large capital letters on the OGP markerboard—a Walmart supervisor, Ms. Lopez, witnessed it and shrugged it off. Moreover, given Mr. Sharpe-Miller's testimony regarding his coworkers' routine or casual use of homophobic slurs, a reasonable jury could infer that at least some of Mr. Sharpe-Miller's supervisors should have known of such discriminatory, harassing conduct. We conclude there is sufficient evidence for a reasonable jury to conclude that Walmart knew or should have known of the hostile work environment. *See West*, 222 F.3d at 776.

### E. Mr. Sharpe-Miller's Constructive-Discharge Claim

Lastly, Mr. Sharpe-Miller challenges the district court's grant of summary judgment for Walmart on his constructive-discharge claim. Even viewing the evidence in

the light most favorable to Mr. Sharpe-Miller and drawing all reasonable inferences in his favor, we agree with the district court that he has not met the high standard required to support a finding of constructive discharge.

### 1. Legal Standards

Title VII prohibits firing a worker because of his protected trait. *United States v. Skrmetti*, 605 U.S. 495, 519 (2025); *accord Tudor*, 13 F.4th at 1028. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is [treated as] a formal discharge . . . ." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).

A constructive-discharge claim requires a showing "[b]eyond that" required for a hostile-work-environment claim. *Id.* at 134. In our circuit, a plaintiff can establish a constructive discharge by showing that "a reasonable person in the employee's position would view h[is] working conditions as intolerable and would feel that []he had no other choice but to quit." *Tran v. Trs. of the State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004); *see also Pa. State Police*, 542 U.S. at 134 ("[T]o establish 'constructive discharge,' the plaintiff . . . must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response.").

"In determining whether an employee's working conditions would cause such feelings in a reasonable person, we apply an objective test under which neither the employee's subjective views of the situation, nor h[is] employer's subjective intent with regard to discharging h[im], are relevant." *Tran*, 355 F.3d at 1270. "The question is not

whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Id.*

This burden is "substantial." *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008). In contrast to our plethora of cases rejecting constructive-discharge claims, we have only found five published cases in which we have held a constructive-discharge claim was viable: *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992); *Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1574 (10th Cir. 1992); *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009); *Hernandez*, 684 F.3d at 961; and *Lockheed Martin Corp. v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 717 F.3d 1121, 1135 (10th Cir. 2013).

For example, in *Acrey*, we affirmed, in relevant part, the district court's judgment entered on a jury verdict for an employee who brought a constructive-discharge claim under the Age Discrimination in Employment Act. *See* 981 F.2d at 1576. We concluded that the plaintiff had "presented sufficient evidence to support the jury's determination that she was constructively discharged." *Id.* at 1574. The facts supporting constructive discharge were as follows:

> Plaintiff was evaluated negatively immediately after the merger was approved. . . . [S]he was treated as incapable and uneducable throughout the final months of her employment. . . . [O]n at least two occasions White, her immediate supervisor, asked her to quit, citing her age and her "image." Plaintiff testified that on August 22, 1989, Rodger Wasson[, another of her supervisors,] asked her to resign and told her that "if [she] didn't [she] would be fired." . . . Her supervisor had confronted her with a litany of performance shortcomings; long-standing job responsibilities were taken from her; and she received inadequate information and training to perform her new duties.

50

*Id.*; *see also Lockheed Martin*, 717 F.3d at 1134–35 (affirming constructive discharge finding where employee, after engaging in protected activity, lost her leadership position, received lower performance ratings, was discouraged from applying for a new job within the company that she was qualified for, was "made to work from home or out of the visitor's office, which doubled as a storage room," and was "kept in a constant state of uncertainty as to whether she would continue to have a job and, if so, what her job would be").

## 2. Analysis

Guided by the foregoing cases, we cannot conclude that Mr. Sharpe-Miller has shown that he was subjected to such intolerable conditions such that an objectively reasonable person in his place would believe he had no choice but to quit. To be sure, Mr. Sharpe-Miller has shown that he was subjected to repeated homophobic words and gestures by coworkers and supervisors. But he has not shown that a reasonable employee would have been prevented from doing his or her job by these discriminatory words and gestures and left with no choice but to quit.

Further, Mr. Sharpe-Miller has shown that he was incorrectly terminated, but he was promptly reinstated and was given no reason to believe he would be terminated again. His brief termination did not cause him to work any days without pay. Moreover, though he was demoted, demotion alone is not sufficient under our cases to establish constructive discharge. Moreover, Mr. Sharpe-Miller was not told that he needed to quit; he was not denied training; and he was not denied access to resources.

In sum, unlike our cases where we have sustained constructive-discharge claims, Mr. Sharpe-Miller has cited no evidence to show that he was prevented from performing his job, led to believe it was only a matter of time before he was fired, or left with no reasonable choice but to quit. A reasonable jury could not conclude that Mr. Sharpe-Miller was constructively discharged. Accordingly, we conclude that the district court properly granted summary judgment to Walmart on this claim.

### III. Conclusion

For the foregoing reasons, we conclude that Mr. Sharpe-Miller cannot move forward with his disparate-treatment claims arising out of the discrete acts of his demotion or termination, his retaliation claim, or his constructive-discharge claim. However, he has presented sufficient evidence to support a viable hostile-work-environment claim.

Accordingly, we **affirm** the district court's judgment as to all of the challenged claims, *except for* his hostile-work-environment claim; as to that claim, we **reverse** the district court's judgment and **remand** for further proceedings consistent with this opinion.